Joseph E. GERASTA and Josefina E. Gerasta, wife of Joseph E. Gerasta

v.

HIBERNIA NATIONAL BANK and U. S. Building Materials Co., Inc.

Civ. A. No. 74–990.

United States District Court, E. D. Louisiana.

Dec. 23, 1975.

Supplemental Opinion Feb. 23, 1976.

**53.** *Id.*

R. Collins Vallee, New Orleans, La., for plaintiffs.

Harry T. Howard, III, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Hibernia Nat. Bank.

Wayne M. Babovich, Carl & Roussel, New Orleans, La., for U.S. Building Materials Co., Inc.

BOYLE, District Judge:

The plaintiffs, Mr. and Mrs. Joseph E. Gerasta, instituted this action pursuant to Section 130 of the Consumer Credit Protection Act of 1968 (hereinafter Act), 15 U.S.C. § 1601 et seq., popularly referred to as the Federal Truth-In-Lending Act, and Regulation Z, 12 C.F.R. § 226, promulgated by the Board of Governors of the Federal Reserve System (hereinafter Board) in accordance with 15 U.S.C. § 1604.

The complaint charges that the defendants, Hibernia National Bank (hereinafter Hibernia), and U.S. Building Materials Co., Inc. (hereinafter Building Materials), failed to adequately notify the plaintiffs of their right to rescind, required by Section 1635 of the Act in situations where a security interest will be acquired in the consumer's residence, and also failed to disclose that a materialman's lien could possibly affect the property by operation of state law.

Although the plaintiffs allegedly exercised their right to rescind and are asking for our confirmation of this act, additional recovery is sought in the form of statutory damages per violation, per plaintiff and per defendant, as well as costs and reasonable attorney's fees.

The complaint also invokes our pendent jurisdiction for alleged violations of the Louisiana Unfair Trade Practice and Consumer Protection Act of 1972, LSA–R.S. 51:1401 et seq., and for breach of contract.[1]

Defendant Hibernia had filed a counterclaim against the plaintiffs for the balance of all unpaid installments on the promissory note securing the loan made, together with interest at the rate of $7\frac{3}{4}\%$ per annum from June 24, 1974 until paid, costs and attorney's fees, but such claim is no longer in the case.[2]

The case was tried to the Court, sitting without a jury. Jurisdiction is conferred by 15 U.S.C. § 1640(e) and venue is properly laid in the Eastern District of Louisiana.

The testimony of the witnesses regarding the sequence of events was conflicting. We find the facts to be as follows:

In August of 1972, the plaintiffs purchased a two-family ("shotgun-double") residence located at 804–808 Valence Street in New Orleans. This acquisition was made with funds procured through a government loan, secured by a "V.A." mortgage. The acquisition was made while the plaintiffs were renting an apartment at 4306 Prytania Street. They own no other real property.

Both sides of the Valence Street property were initially rented for an uncertain period of time.[3]

---

1. The doctrine of pendent jurisdiction requires that "[t]he state and federal claims . . . derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 228 (1966). *See also, Moor v. County of Alameda*, 411 U.S. 693, 711, 93 S.Ct. 1785, 1797, 36 L.Ed.2d 596, 610 (1973).

We are powerless, therefore, to consider that portion of the plaintiffs' complaint relating to a cause of action for breach of contract and that claim should be dismissed, without prejudice, for lack of subject matter jurisdiction.

2. During the course of the trial, we granted Hibernia's own motion to dismiss this counterclaim, without prejudice. Hibernia had previously dismissed, without prejudice, its crossclaim against Building Materials and its third party complaint against Leon C. Salloum.

3. At the time of the agreement with Building Materials, Mr. Gerasta was receiving rental in-

It was the plaintiffs' ultimate intention, however, to reside at 808 and rent 804. They, in fact, moved to that address in January of 1974 and reside there presently.

Prior to occupancy, the plaintiffs desired to renovate the property[4] which was not ideally suitable for habitation.[5] Building Materials was selected as a possible contractor through a newspaper advertisement.

Mr. Gerasta telephoned and spoke to Ray C. Newman, then a salesman with Building Materials, who met with him at the Valence Street address. A list of work to be performed was prepared and a cost estimate was arrived at.

When payment was discussed, a home improvement loan was suggested, but Mr. Gerasta indicated a reluctance to obtain his own financing. Mr. Newman was then authorized to make the credit arrangements and at no time did the plaintiffs have any contact with bank officials.

At this time, an undated contract was executed by Mr. Gerasta, under which the repairs and/or renovations were to be made for an amount totalling $7,487.00.[6] Apparently, Mrs. Gerasta was not present at the time of signing.

Building Materials' standard form contract, which was used, contains the following language: "To facilitate payment, the Owner agrees to permit CONTRACTOR to attempt to obtain a loan for him through a reliable source . . . ." Mr. Newman had written on the contract in this particular case that the "[o]wner [was] to obtain financing through Hibernia National Bank."

Sixty percent of Building Materials' home improvement contracts are financed through Hibernia. Its program is attractive to customers and promoted by Building Materials because ninety percent of the time a second mortgage is not required. In lieu of such a mortgage, generally, the bank relies, for protection, on an agreement not to encumber.

Accordingly, Mr. Gerasta applied to Hibernia for a property improvement loan by an application prepared by Mr. Newman and dated March 29, 1973.[7] Although the information obtained was incomplete, approval was telephonically obtained by Mr. Newman on that date and he made the appropriate notations on the application form.

On March 30, 1973, Mr. Newman met with the plaintiffs at their Prytania residence. On this occasion, he spoke to Mrs. Gerasta for the first time and her credit obligations, as well as the name of her nearest relative, were added to the loan application.

Mr. Gerasta indicated his approval by signing the proposed construction plan, prepared by Fred W. Paquette, only after Mr. Newman had made several corrections and/or additions to it.[8] It is not

---

come of $75.00 per month from a Mr. Hartel, who occupied 804. See note 7 infra.

Prior to this time, 808 had been leased to a tenant by the name of Valerie and approximately three months rent of $75.00 a month was collected from him. When the original home improvement contract was executed, however, 808 was vacant.

4. The contemplated repairs were to take approximately two months.

5. The premises were extremely dirty, in need of paint, and there were holes in the walls and floor.

6. See Exhibit P–1. The improvements were to include "paneling, v/a floors, [a] new tub and shower, vanity dresser, kitchen cabinets and double ,s/s sink." Also, an addition was to be built to the rear of the existing structure of approximately 12' x 27'. All this was to be

done "per plans provided by the contractor and approved by the owner." Id.

7. See Exhibit H–1. The application demonstrated that the cost of improvements would be $7,487.00—the amount of the contract signed by Mr. Gerasta on the same day.

It also indicated that Mr. Gerasta was receiving rental income from one-half of the house, i. e., 804 Valence Street. The property to be improved was 808 Valence Street.

8. See Exhibit P–7. One addition was the placement of a 110 volt outlet for an air conditioning unit in the 808 side only. Also, the contractor was to "move W&D [washer and dryer] [h]ookup to tenants side as far as possible enlarging Owners side." Id. To do this would require placing of the partitions in the addition to the 804 side of the center of the addition.

clear whether these changes were contemplated at the earlier meeting and simply not communicated adequately.[9]

In any event, these items added $992.00 to the original figure, bringing the cost figure then to $8,479.00. The latter amount was that eventually financed through Hibernia.[10] If a separate or supplemental credit application was prepared, reflecting the additional monies needed to perform the work requested, it was not offered nor admitted into evidence.

On April 10, 1973, Herbert Wax, Manager of Hibernia's St. Claude Branch Office, drafted a disclosure statement and notice of right of recission (hereinafter notice) similar to those required by federal law. On that date, Mr. Newman was given two copies of the notice and one copy of the disclosure statement, which he took to the plaintiffs' Prytania Street home for their signature.

The disclosure statement listed the principal amount financed as $8,479.00, with an annual interest rate of 14.75%, and a total interest payment of $4,746.71.[11]

Both Mr. and Mrs. Gerasta were stated to be the borrowers. According to the statement, the loan was to be secured only by a second mortgage. No mention was made of a possible materialman's lien that could arise out of the performance of the contract.

The notice[12] stated that the transaction was entered into and consummated on the date of its preparation or April 10, 1973[13] and that it could be rescinded by notification sent not later than midnight of April 12, 1973.[14]

There is a special section in Hibernia's consumer credit department which is assigned the responsibility of examining truth-in-lending documents for errors in computation, notification deadlines, etc., and returning to Mr. Wax those found to be incorrect. No errors in the notice and disclosure statement, drafted for the plaintiffs' benefit, were brought to his attention.[15]

Mr. Newman read the contents of these documents to the plaintiffs and explained their significance, as he had done for other customers on many previous occasions.[16]

Both Mr. and Mrs. Gerasta acknowledged, by their signature, receipt of a copy of the disclosure statement, but only Mr. Gerasta indicated a desire for credit life insurance. He also acknowledged receipt of two copies of the notice. Because these signatures were not

9. Mr. Gerasta's native tongue is Dihaya. He first learned to speak English when he was ten years old and had some difficulty speaking and understanding that language.

10. *See* note 11 *infra* and accompanying text.

11. *See* Exhibit P–3 or H–2. The finance charge was calculated to be $5,448.52 and included the interest plus $100.00 to cover the cost of the notarial act and $601.81 for insurance. The credit life insurance requested by Mr. Gerasta would be an additional $401.20, for a deferred payment balance, therefore, of $14,328.72.

12. *See* Exhibit P–4 or H–3.

13. Although the notice was prepared on April 10, 1973, it will be shown that the transaction was not consummated on that date, but rather on April 14, 1973. *See* text, p. 189 *infra.*

14. These dates were entered by hand in the corresponding blank portions of the standard notice form required by 12 C.F.R. § 226.9(b). This form also contained typewritten language instructing the plaintiffs that they would be permitted to cancel within three business days from the date of the transaction or any later date on which all material disclosures required by federal law were given to them.

15. W. M. Bernard, supervisor of the consumer credit department, was not called to testify by any of the parties. Mr. Wax stated, however, that, on other occasions, errors had been discovered before the documents were given to the customer and that this was the one and only time a mistake had not been timely found.

16. In addition to the number of truth-in-lending transactions handled for Building Materials, Mr. Newman also gained experience in this area while formerly employed by another bank in New Orleans.

Although aware that federal law permitted a three day recission period and required that the creditor inform the customer accordingly, he did not notice the apparent error made.

obtained until after business hours, Mr. Newman returned the documents to Hibernia on the morning of April 11, 1973.

The plaintiffs were summoned to Mr. Salloum's office at Building Materials on April 14, 1973 to select the materials to be used for renovating the Valence Street property. At this time, the plaintiffs were given the revised construction plan[17] and Mr. Gerasta signed a superseding contract,[18] the work required thereby to be done for a sum total of $8,479.00.

Also on April 14, 1973, both Mr. and Mrs. Gerasta executed a collateral mortgage note and a collateral mortgage securing the note[19] in the amount of $14,328.72. This figure corresponds with the deferred payment balance on the disclosure statement that Mr. Newman gave the plaintiffs on April 10, 1973.[20]

It was at this meeting, the only one which took place in the offices of Building Materials, that Mr. Gerasta expressed some concern regarding the contract guarantee that the work would be done in a workmanlike manner. He indicated to Mr. Salloum that he wanted some form of additional assurance that the job would be satisfactorily performed.

In order to close the deal, Mr. Salloum had a check prepared[21] in the same amount as Hibernia's check[22] to the plaintiffs' order for $8,479.00. Mr. Salloum told them that his check could be cashed if, at any time, they were not satisfied with the quality of the work being done.

The plaintiffs then endorsed Hibernia's check and delivered it to Salloum. Repeated attempts to negotiate the check given to the plaintiffs by Mr. Salloum failed, of course, because Building Materials was a co-payee and its authorized endorsement was required.

By certified letters of October 20, 1973,[23] the plaintiffs sought to rescind

---

17. *See* Exhibits P–8 and D–2. Although the blueprints are identical in substance, Mr. Gerasta indicated his approval by signing D–2, while Leon Salloum, President of Building Materials, signed P–8.

18. *See* Exhibit P–2.

19. *See* Exhibits P–14, 15 and 16. These documents are all dated April 10, 1973. Each is notarized by Victor Lota and the collateral mortgage is witnessed by Val Keller and Lynne Ford.

 Both Mr. Salloum and Mr. Newman testified that the loan papers were signed in their presence. It was also their testimony that this occurred on Saturday, April 14, 1973 and that Mr. Wax, Mr. Lota, Val Keller and Lynne Ford were not present. Apparently, therefore, the documents were prepared on April 10, 1973, but were notarized and witnessed either before or after the plaintiffs signed them on April 14, 1973. Victor Lota, Val Keller and Lynne Ford were not called to testify.

20. *See* note 11 *supra*.

21. *See* Exhibit P–6. The check is dated April 13, 1973, but Mr. Salloum and Mr. Newman testified that it was prepared on April 14, 1973. Both Mr. and Mrs. Gerasta stated that they went to Mr. Salloum's office on Friday, which was stipulated by the parties to have been April 13, 1973. One of the reasons why they were so sure of the date was because they received Mr. Salloum's check on the same day.

 We have determined, however, that this check was presented to them on April 14, 1973. Mrs. Gerasta further testified that the check was prepared by Mr. Salloum's secretary. Although Mr. Salloum and Mr. Newman could not recall or agree on who in fact typed the check, it was not Mr. Salloum's secretary, because she was not present in the office on the day in question.

 Another reason why the plaintiffs claim that they were at the offices of Building Materials on April 13, 1973 was because the meeting took place at 2:00 P.M. and Mrs. Gerasta attended classes at Dominican College only until 1:00 P.M. on Fridays.

 Although she clearly recalls her Friday schedule, incredibly, the witness was hard pressed to remember her schedule on other days of the week. Further, Mrs. Gerasta had previously stated, over a year earlier, that the meeting took place on a Saturday. *See* Record, Document No. 30, pp. 21 and 22.

22. *See* Exhibit P–5 or H–4. As were all the other documents prepared by Mr. Wax, the bank's check was dated April 10, 1973. It was given to the plaintiffs by Mr. Salloum, however, on April 14, 1973. *See* notes 19 and 21 *supra*. Building Materials deposited the check in its account when the bank opened on Monday, April 16, 1973.

23. *See* Exhibit P–13. Tender of the property [loan proceeds] or its fair market value [of the work performed] was refused until such time

the transaction. The defendants took no action to refund to the plaintiffs any money paid by them or to reflect the termination of any security interest created by the transaction. This lawsuit was filed on April 9, 1974.

## JURISDICTION

■ The provisions of the Act apply to and our jurisdiction depends upon an extension of credit, wherein the underlying transaction qualifies as a consumer credit transaction and not one for "business or commercial purposes." 15 U.S.C. §§ 1601, 1603(1). "Consumer credit" is defined as "credit offered or extended to a natural person, in which the money, property, or service which is the subject of the transaction is primarily for personal, family, household, or agricultural purposes and for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments." 12 C.F.R. § 226.2(k); *see also* 15 U.S.C. § 1602(h).

■ In determining whether a particular transaction is exempt, "the purpose of the transaction or extension of credit is controlling" and not the property which is the subject of the security interest involved. *Sapenter v. Dreyco Incorporated*, 326 F.Supp. 871, 874 (E.D. La.), *aff'd*, 450 F.2d 941 (5 Cir.), *cert. denied*, 406 U.S. 920, 92 S.Ct. 1775, 32 L.Ed.2d 120 (1971). We find that the plaintiffs obtained a loan from Hibernia and entered into a contractual agreement with Building Materials for the purpose of repairing and/or improving their intended residence, prior to occupancy.[24] The transaction was not one for "business or commercial purposes"

and, therefore, was not exempt from the provisions of the Act.

## "CREDITOR" SUBJECT TO DISCLOSURE REQUIREMENTS

In enacting truth-in-lending legislation, it was Congress' intention to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601. The disclosure requirements, however, are imposed only on "creditors," or those who *regularly* extend, or *arrange for the extension of credit* for which the payment of a finance charge is required, whether *in connection with* loans, sales of property or *services*, or otherwise." 15 U.S.C. § 1602(f) (emphasis added).

■ The Board has further defined the term "creditor" to mean one "who *in the ordinary course of business* regularly extends or arranges for the extension of consumer credit, *or offers to* extend or *arrange* for the extension of such credit." 12 C.F.R. § 226.2(m) (emphasis added). The exemption is limited, therefore, to those whose "extensions [or arrangement] of credit are an occasional, isolated, and incidental portion of their business." [25]

There can be no doubt that Hibernia is a "creditor" within the meaning of the Act. Building Materials contends, however, that it is not.

■ At the close of the plaintiffs' case, Building Materials moved for dismissal,[26] under Rule 41(b), on the ground that no proof had been presented establishing that arranging credit was a substantial part of its business.

as the defendants responded in the appropriate manner.

**24.** *See* notes 3–6 *supra* and accompanying text. *See also* note 26 *infra*.

**25.** *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 649 (9 Cir. 1974). The *Eby* court examined both the Senate and House reports and found that the only relevant comment indicated that the term "creditor" was to be read expansively. The rationale for requiring disclosure of only

"creditors" was, according to this court, because others "could not be expected to know the law or be able, without considerable trouble, to follow its directives." *Id.* at 650.

**26.** At this time, we denied Building Materials' initial motion to dismiss, which was based on the plaintiffs' failure to demonstrate that a "consumer credit" transaction was involved. *See* note 24 *supra* and accompanying text.

We reserved ruling on the motion. Announcing our decision *nunc pro tunc*, we deny Building Materials' motion to dismiss, in order to consider all the evidence.[27]

The regulations define an "arranger of credit" as one who provides or offers "to provide consumer credit which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service *or* has knowledge of the credit terms *and* participates in the preparation of the contract documents required in connection with the extension of credit." 12 C.F.R. § 226.2(f) (emphasis added).

The standard contract form used by Building Materials contains a clause which authorizes the contractor to arrange for financing, if required, on behalf of the property owner. Furthermore, Building Materials handled the necessary details, on behalf of its customers, in order to obtain credit financing for sixty percent of its contracts. Building Materials did not participate, however, in the preparation of the loan documents, which were prepared solely by the bank.

■ The fact that Mr. Newman completed the loan application and obtained approval from Hibernia is not sufficient, in and of itself, to warrant holding Building Materials to a "creditor's" responsibilities. *See, e. g.,* Federal Reserve Board Advisory Letter No. 158 of October 16, 1969, *quoted in,* CCH Consumer Credit Guide ¶ 30, 497. Although not binding, these letters are entitled to great weight because they represent the "experience and informed judgment" of an agency to which Congress has delegated substantial authority. *See Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Allen M. Campbell Co. v.*

*Lloyd Wood Const. Co.,* 446 F.2d 261 (5 Cir. 1971).

The fact that Mr. Newman explained the contents of the notice and disclosure form to the plaintiffs before obtaining their signatures and that the execution of the loan instruments, as well as the passage of the borrowed funds, took place in the offices of Building Materials, in the absence of any bank official, would go to the issue of "knowledge" of the credit terms.

■ Participation in the preparation of the loan documents is essential, at least where a fee or its equivalent is not received, to a finding that one is an "arranger of credit" within the meaning of 12 C.F.R. § 226.2(f). *See, e. g., Manning v. Princeton Consumer Discount Co., Inc.,* 380 F.Supp. 116 (E.D.Pa.1974) (sufficiency of allegations in the complaint); Federal Reserve Board Advisory Letters Nos. 344 and 105 of June 4, 1970 and September 5, 1969, *quoted in,* CCH Consumer Credit Guide ¶¶ 30, 399 and 30, 154. *See also,* Federal Reserve Board Advisory Letter No. 124 of September 25, 1969 and October 15, 1969, *quoted in,* CCH Consumer Credit Guide ¶¶ 30, 475 and 30, 557.

■ There is uncontradicted testimony that Building Materials received no fee for referring its customers to Hibernia. It becomes necessary to determine, therefore, whether the ongoing business relationship between the two concerns resulted in "compensation or other consideration." We think not.

There can be no doubt that Building Materials benefited from the relationship because without Hibernia's financing, many of its contracts would likely go fallow. There is no evidence, however, to indicate that Hibernia would be any more willing to advance funds on a home improvement loan simply because Building Materials was to be the contractor. In other words, the plaintiffs have not shown that Hibernia would approve the

---

**27.** Rule 41(b) permits the exercise of this option. *See Wealden Corp. v. Schwey,* 482 F.2d 550, 551–52 (5 Cir. 1973); *Smith Petroleum*

*Service, Inc. v. Monsanto Chemical Co.,* 420 F.2d 1103, 1116 (5 Cir. 1970).

loan applications referred to it on the basis of anything other than the application itself, the credit of the applicant and/or the security offered. Further, Building Materials did not guarantee the loans.

Accordingly, we find that Building Materials is not an "arranger of credit" and, therefore, not a "creditor" within the meaning of the Act. As such, it is not subject to the Act's provisions relating to disclosure.

## DISCLOSURE REQUIREMENTS AND VIOLATIONS OF THE ACT

15 U.S.C. § 1631(a) states that "[e]ach creditor shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom consumer credit is extended and upon whom a finance charge is or may be imposed, the information required . . . ."

■ Although Congress was concerned with abuses flowing from a creditor's use of mortgages, such as Hibernia's practice in this case, it was equally concerned with the improper use of other types of liens.[28] Therefore, disclosure is required "of all the consequences flowing from the signing of a home improvement contract, including . . . those necessarily inherent therein." *Gardner & North Roofing and Sliding Corp. v. Board of Governors of Federal Reserve System,* 150 U.S.App.D.C. 329, 332, 464 F.2d 838, 842 (1972). *See also, N. C. Freed Co., Inc. v. Board of Governors of Federal Reserve System,* 473 F.2d 1210, 1216 (2 Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973).

The Louisiana Private Works Act, and particularly LSA–R.S. 9:4801, establishes a lien in favor of those who provide labor, materials, machinery or fixtures, except lessors and lessees of movable property, for the "repair, or improvement of immovable property . . . with the consent or at the request of the owner . . . ."[29]

■ Although the contract executed between Mr. Gerasta and Building Materials contained some language concerning such a lien,[30] it is the plaintiffs' contention that the possibility of a security interest in the property, by way of a materialman's lien, should have been revealed in a disclosure statement.

Building Materials received payment, for the work it was to perform, when the transaction was consummated. For this reason, there would be no basis for a statutory lien in its favor and none would arise.

By contract, however, Building Materials requires the property owner to allow the work to be completed, at least in part, by subcontractors. If Building Materials, as the prime contractor, fails to pay its subcontractors, carpenters, laborers, etc., or materialmen, the latter could also levy on the property to collect payment, regardless of the fact that the owner may have satisfied his obligation to the prime contractor.

The Truth-in-Lending Act is remedial in nature and, as such, its terms are to

---

28. "Any credit transaction which involves a security interest in the property must be clearly explained to the consumer as involving a mortgage *or* lien. . . ." 114 Cong.Rec. pt. 11, 14388 (1968) (remarks of Representative Sullivan) as quoted in *Freed Co., Inc. v. Board of Governors of Federal Reserve System,* 473 F.2d 1210, 1216 (2 Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973) (emphasis added).

29. This "privilege" secures payment, in principal and interest, for the work performed or the materials, machinery or fixtures furnished and the cost of recordation.

30. *See* note 18, *supra.* The following was part of that agreement:

"The Owner agrees that the obligation of the Owner and the rights of the Contractor, including the Contractor's lien or privilege, may be transferred and assigned, and that any note made by the Owner and furnished to the Contractor in connection therewith may be endorsed and transferred, all without operating a novation of the Owner's obligation under the contract, or adversely affecting the Contractor's lien or privilege." *Id.*

**188**

be liberally construed in favor of the consumer. *See Sellers v. Wollman,* 510 F.2d 119 (5 Cir. 1975). We find, therefore, that the possibility of a materialman's lien should have been disclosed to the plaintiffs.[31] To hold otherwise would be to frustrate the intended purpose of the Act which is, as we have said, to promote the informed use of credit. *Bussey v. Georgia Bankamericard,* 516 F.2d 452, 457 (5 Cir. 1975).

Hibernia prepared and the plaintiffs received only one copy of the disclosure statement.[32] It is argued, however, that a separate disclosure statement should have been presented to each of the plaintiffs.

■ As a general rule, a creditor need furnish a statement of required disclosures to only one of the customers to the transaction. The general rule does not apply, however, where the transaction is one which may be rescinded. 12 C.F.R. §§ 226.6(e), 226.603 and 226.902(b).

The right of recission exists in "any consumer credit transaction in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any real property which is used or is expected to be used as the residence of the person to whom the credit is extended . . . ." 15 U.S.C. § 1635(a), as amended by P.L. 93–495 (1974). The Board has added the requirement that the residence involved be the customer's principal residence and defines the latter as "any real property in which the customer resides or expects to reside." 12 C.F.R. §§ 226.2(y), 226.-9(a).

■ We have previously determined that this was a "consumer credit" transaction. We now find that a security interest was (second mortgage) retained or could be (materialman's lien) acquired in the customer's principal residence.[33] Because this was a rescindable transaction, both Mr. and Mrs. Gerasta were entitled to the truth-in-lending disclosures.[34] *Simmons v. American Budget Plan, Inc.,* 386 F.Supp. 194 (E.D.La.1974).

**31.** 12 C.F.R. § 226.901(b) states that even in the event that the "creditor" or prime contractor waives his lien rights, "if as a result of the transaction, a security interest is or will be retained or acquired by a subcontractor, workman, or other person, the transaction is rescindable . . . [and] the creditor would be responsible for delivering the recission notice as well as other applicable disclosures, delaying performance as provided under § 226.9(c), and identifying himself as the creditor on the recission notice." *See also, e. g.,* Federal Reserve Board Advisory Letter No. 135 of October 9, 1969, *quoted in,* CCH Consumer Credit Guide ¶ 30, 481.

There was no evidence that such a lien did in fact arise out of the work performed by Building Materials.

**32.** Both Mr. and Mrs. Gerasta signed the statement acknowledging "receipt of a copy." *See* note 11 *supra.* This could mean that they each received an individual copy or that a single copy was furnished and that they both indicated, by their signature, receipt of that single copy. We believe the evidence demonstrates the latter interpretation to be correct.

**33.** *See* note 24 *supra.* "Customer" is defined by the regulations to include a "comaker, endorser, guarantor, or surety . . . who is or may be obligated to repay the extension of

consumer credit." 12 C.F.R. § 226.2(*o* ). Both Mr. and Mrs. Gerasta executed the loan documents.

**34.** *See* Federal Reserve Board Letter No. 410 of September 28, 1970, *quoted in,* CCH Consumer Credit Guide ¶ 30, 592.

Assuming that Mrs. Gerasta had constructive notice of the disclosed information, a separate statement would be necessary, if she also desired credit life insurance, as Mr. Gerasta's signature occupied the only space.

15 U.S.C. § 1605(b)(1)(2) and 12 C.F.R. § 226.4(a)(5)(i) & (ii) require that the charge for credit life insurance be included in the finance charge, rather than in the amount financed, unless: (1) the insurance charge is optional and this fact is clearly disclosed; and (2) any customer *desiring* such insurance signs a specific, separate and dated affirmation of this desire, after the cost has been disclosed to him.

There is no requirement that the customer sign a separate acknowledgment if he does not desire insurance. In order to establish a violation of Section 1605, as plaintiffs contend, therefore, it would be necessary to prove that Mrs. Gerasta sought to be or was in fact insured. No evidence was introduced on this point. The fact that only her husband signed the separate acknowledgment for insurance, even though both executed the loan docu-

It is also the plaintiffs' position that they were not adequately informed of their right to rescind the transaction. In particular, it is claimed that: (1) a notice was not prepared for and delivered to Mrs. Gerasta; (2) only 48 hours was given to exercise the right of recission; and, (3) Hibernia's address was not in 10 point boldface type or 10/72's of an inch high.

### (1)

If a transaction is rescindable, the creditor is required to clearly and conspicuously disclose that fact to any obligor, in accordance with the Board's regulations, and provide an adequate opportunity to exercise this right of cancellation. 15 U.S.C. § 1635(a). The regulations provide that two copies of the notice must be furnished, one of which may be used by the customer to cancel the transaction. 12 C.F.R. § 226.9(b).

Mr. Gerasta signed the notice and acknowledged receipt of two copies of it. Plaintiffs' counsel has not attempted to rebut the presumption of delivery created by this acknowledgment and 15 U.S.C. § 1635(c). That two copies of the notice was furnished, therefore, is established.

 It is maintained, however, that two copies of the notice should have been given to each of the plaintiffs. A literal reading of the Act would require such a result and the Board has interpreted it in this manner.[35] We find,

therefore, that Mrs. Gerasta was not advised of her right to rescind.[36]

### (2)

The notice that was given contained typewritten language to the effect that the transaction could be rescinded within three business days from the date that the transaction was consummated.[37] Filling in the applicable dates, however, Mr. Wax wrote on the form that the transaction was consummated on April 10, 1973 and that recission could be effectuated if notice of such was sent not later than midnight of April 12, 1973.

12 C.F.R. § 226.2(cc) provides that "[a] transaction shall be considered consummated at the time a contractual relationship is created between a creditor and a customer irrespective of the time of performance of either party." We have previously found that Mr. Gerasta entered into a superseding contract with Building Materials and that the plaintiffs executed the loan documents with Hibernia on April 14, 1973.[38] We now find that the transaction was consummated on that date and not on April 10, 1973, as represented.

 Hibernia contends that 15 U.S.C. § 1640(c)[39] insulates it from civil liability because April 12, 1973 was mistakenly stated to be the recission deadline, rather than April 13, 1973. Whether or not that Section could be successfully invoked had the transaction been consummated on April 10, 1974,[40] it can

ments, is not a violation. *See* Federal Reserve Board Advisory Letter No. 624 of August 9, 1972, *quoted in,* CCH Consumer Credit Guide ¶ 30, 873.

**35.** *See, e. g.,* Federal Reserve Board Advisory Letters Nos. 208 and 361 of December 11, 1969 and June 29, 1970, *quoted in* CCH Consumer Credit Guide ¶¶ 30, 236 and 30, 423.

**36.** This is true, whether or not she had constructive knowledge of her rights under the Act either because of the disclosures actually made to her husband or because her attorney informed her of such subsequent to the transaction.

**37.** *See* note 14 *supra.* It also stated, as required by 12 C.F.R. § 226.9(b), that the transaction could also be rescinded within three business days from the date on which all ma-

terial disclosures were given. This limitation was the one which would ultimately control. *See* note 46 *infra* and accompanying text.

**38.** *See* notes 18 and 19 *supra.*

**39.** "A creditor may not be held liable . . . for a violation . . . if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

**40.** The error in informing Mr. Gerasta of the recission deadline was not the only error committed by Hibernia, but it was the only one to which the Section could conceivably apply, based on the nature of the defense and the testimony of the witnesses.

be no defense to the fact that the plaintiffs had until midnight of April 17, 1973 to rescind and were not so informed.[41]

#### (3)

■ The only reference to 10 point bold type is made in 12 C.F.R. § 226.6(a) which refers to "numerical amounts and percentages" and even where such figures are involved, they may be "legibly handwritten."

12 C.F.R. § 226.9(b) requires, however, that the standard notice form, provided in that regulation, be used and printed in 12 point boldface type. Before furnished to the customer, the creditor is to complete the blank portions with, among other information, his address.

Apparently the completed material does not have to be in typewritten form and if not, the type requirement would not be applicable. If Hibernia had not printed its address, the plaintiffs could not complain of the type used. The fact that it chose to print that information, in other than 12 point boldface type,[42] therefore, is not a violation.

■ The plaintiffs also contend that the defendants did not delay performance until after the recission period had expired and they had satisfied themselves that the right to cancel had not been exercised.[43]

The plaintiffs have not established that, prior to April 18, 1973, any physical changes were made to the property or that any deliveries were made to their residence. It is clear, however, that Hibernia disbursed the loan proceeds to plaintiffs who in turn paid them over to Building Materials prior to the expiration of the recission period.[44] Accordingly, Hibernia has not complied with 12 C.F.R. § 226.9(c).

### RECISSION

When the creditor fails to disclose the required information, the consumer's right to rescind is not limited by the normal three day period, but continues until all the disclosures are made or (since the 1974 amendment) until the expiration of three years from the date of the consummation of the transaction. 15 U.S.C. § 1635(a) and (f) as amended.

■ The plaintiffs, by certified letters dated October 20, 1973,[45] notified the defendants of their election to cancel before several material matters had been disclosed to them. We find, therefore, that the right to rescind was properly exercised.[46]

Hibernia requests that we consider conditioning our recognition of the plaintiffs' right to rescind (and proper exercise thereof) on compliance with our order that they return to Hibernia the principal of the loan received and further suggests that we have the power to do so.

---

41. Good faith is not an excuse. The error is intentional even though mistaken, within the meaning of the Act, if not clerical in nature. *See Starks v. Orleans Motors, Inc.*, 372 F.Supp. 928 (E.D.La.), *aff'd per curiam*, 500 F.2d 1182 (5 Cir. 1974) and cases cited therein.

Mr. Wax apparently thought that the deal would be closed on April 10th. The fact that he did not supervise the closing or have it at the bank, which would have made him aware that the transaction documents required some revision, approaches negligence on his part, and could not be said to be a clerical error.

It is asserted by the plaintiffs that the section is not available unless pleaded as an affirmative defense and/or listed in the pre-trial order, which controls the course of the trial. *See* Record, Document No. 37. Because we have found that 15 U.S.C. § 1640(c) is not applicable under the facts of this case, we do not reach that contention. Further, this defense is not claimed with respect to any other violation.

42. For an illustration of 12 point type, see CCH Consumer Credit Guide ¶ 1840.

43. 12 C.F.R. § 226.9(c). The creditor is prohibited from: (1) disbursing any money other than in escrow; (2) making any physical changes in the customer's property; (3) perform any work or service for the customer; or (4) making any deliveries to the customer's residence, if the creditor has retained or will acquire a security interest other than one arising by operation of law.

44. *See* notes 21 and 22 *supra*.

45. *See* note 23 *supra*.

46. *See* Exhibit P–13.

15 U.S.C. § 1635(b) provides that when an obligor exercises his right to rescind, he is *automatically* not responsible for any finance or other charge and any security interest involved in the transaction becomes void.

In order to obtain possession of any "property", including loan proceeds, delivered by the creditor to the obligor, however, the creditor must take *affirmative action* of the type and within the time period contemplated by Section 1635(b). Within ten days of the recission, the creditor must return to the obligor any money given and take such steps as are necessary or appropriate to reflect the termination of any security interest created.

The consequences of inaction on the part of the creditor are clear. The orderly progression of specific acts contemplated by the statute, culminating in the debtor's tender of the property and the creditor's recoupment, has been disrupted and ownership of the "property" vests in the obligor without *any* obligation to pay for it. *Sosa v. Fite,* 498 F.2d 114, 119 (5 Cir. 1974).

The plaintiffs' letter was received by Hibernia on October 22, 1973 and by Building Materials on October 23, 1973.[47] Hibernia took no action within ten days, or by November 1, 1973, to return any payments made on the loan[48] and to reflect the termination of any security interest, including the cancellation of the inscription of the second mortgage in the public records, if such an inscription existed at the time.[49]

Because Hibernia chose not to respond within ten days of the date upon which the plaintiffs rescinded the transaction, tender by the plaintiffs of the loan proceeds ("property") was, therefore, not required and they are entitled to retention thereof without any further obligation.[50] Although not specifically requested, the plaintiffs are also entitled to full restitution of all amounts previously paid to Hibernia, *see Sosa v. Fite,* supra, at 120, and to have the inscription in the public records of the second mortgage, if one exists, cancelled.[51]

Although it is true that a decree granting recission, which does not condition the relief upon the debtor's restoration of the *status quo ante*, is a harsh remedy, Hibernia could have avoided it by complying with the provisions of the Act. *Palmer v. Wilson,* 502 F.2d 860, 864 (9 Cir. 1974) (Wright, J., concurring in part and dissenting in part); *Sosa v. Fite,* supra, at 120.

## DAMAGES

It is Hibernia's initial position that recission under Section 1635 precludes the monetary award provided in Section 1640,[52] citing *Bostwick v. Cohen,* 319 F.Supp. 875 (N.D.Ohio 1970).

Hibernia contends that a purported compromise, *see* Exhibit D–3, between counsel for the plaintiffs and Building Materials, nullified whatever effect an attempted recission might have had. We are of the opinion, however, that this agreement does not effect a settlement of the plaintiffs' truth-in-lending claims and, as such, it is not relevant to the recission issue.

47. These dates were stipulated to by the parties.

48. No evidence was introduced at the trial to demonstrate how many payments were in fact made. Post trial, counsel for the plaintiffs and Hibernia stipulated, however, that six payments of $152.76 were made, for a total payment of $916.56. *See* Record Document No. 48.

 Building Materials also did not respond to the plaintiffs' letter; but, because we have found it was not a "creditor" within the meaning of the Act, it was not required to do so.

49. No evidence was submitted to show whether or not the second mortgage was ever recorded.

50. *Sosa v. Fite, supra; contra, Ljepava v. M.L. S.C. Properties, Inc.,* 511 F.2d 935 (9 Cir. 1975).

51. The complaint did contain a request, however, for such other general and equitable relief as the law and the facts may warrant. This is sufficient. *See* Rule 54(c) F.R.C.P.

52. 15 U.S.C. § 1640(a) provides, in pertinent part, that "any creditor who fails to comply with any requirement imposed under this chapter or chapter 4 of this title with respect to any person is liable to such person in an amount equal to the sum of—

The basis of that decision, aside from reliance on the general contract principle that rescission is inconsistent with a remedy predicated on affirmance of the contract, was that a debtor is not "aggrieved" within the meaning of the Act where recission is elected, because he is not required to pay a finance charge.

The United States Supreme Court has considered this latter argument in another context, however, and has determined that the imposition of the Section 1640 penalty for "civil liability" is proper even "where the finance charge is nonexistent or undetermined." *Mourning v. Family Publications Service, Inc., supra* at 376, 93 S.Ct. at 1664, 36 L.Ed.2d at 333–34. Also, as a "civil penalty," Section 1640 is not a remedy for breach of contract. *Sellers v. Wollman, supra,* at 122.

Because the rationale for the court's opinion in *Bostwick* is faulty, the case provides no support for the defendant's claim. We find, therefore, that recission in and of itself does not preclude Section 1640 relief where the notice provisions of the Act have been violated.

▮ Alternatively, Hibernia contends that although recission and damages may not be mutually exclusive remedies, a court is not required under the Act to grant both forms of relief where requested. It is argued that such a request is addressed to a court's sense of equity and may be denied where the facts of a particular case do not warrant such a result.

> (1) any actual damage sustained by such person as a result of the failure;
> (2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000 . . . ."

**53.** The plaintiff, in *Sosa v. Fite, supra,* sought only recission. The court, in *Sellers v. Wollman, supra,* did say that where the notice provisions of the Act are violated, relief under both Section 1635 and Section 1640 is appropriate. In order to ascertain whether the district court felt that this was not a proper case for the award of both, however, the decision was vacated and remanded.

The Fifth Circuit Court of Appeals, which we are bound to follow, has not had an opportunity to rule on the validity of this argument.[53] The Ninth Circuit has approved such an approach.[54] We believe such an approach is proper in this case.

By refusing to condition our recognition of the plaintiffs' right to rescind on tender of the loan proceeds, Mr. and Mrs. Gerasta have been enriched.

They have made some payments to Hibernia, but they are entitled to a return of these payments and are permitted to retain without obligation, the loan proceeds. The plaintiffs paid over the proceeds of the loan to Building Materials for the work it was to perform under the home improvement contract. A further benefit to them would be the improvements Building Materials claimed it made to the property which were not called for in the contract, but which Building Materials did in order to satisfy demands of Gerasta before this litigation was instituted, if plaintiffs are not obliged to pay for those and the contracted for improvements.

The relief we grant the plaintiffs and the incidental benefits which have accrued and will accrue to them out of the transactions satisfy the demands of legislative policy of full disclosure and the remedial nature of the Act. We find, therefore, that this is not a proper case for the award of both Section 1635 and Section 1640 relief.[55]

**54.** See *Palmer v. Wilson, supra,* at 862; *Eby v. Reb Realty, Inc., supra,* at 652.

**55.** The result we reach eliminates the need to consider the plaintiffs' request for statutory damages per defendant. We also need not reconsider our decision in *Simmons v. American Budget Plan, Inc., supra,* wherein we found that both husband and wife were entitled to the statutory penalty when the transaction was rescindable by either and disclosure was only made to one of them. It is clear, however, that as to closed end transactions, only one statutory penalty will be assessed for multiple violations where only one customer is involved.

## ATTORNEY'S FEES AND COSTS

 Although we have determined that the equities of this case do not warrant the award of Section 1640 relief, the plaintiffs are nevertheless entitled to an award of reasonable attorney's fees and costs. *Sosa v. Fite, supra,* at 121–122.

Since no evidence was offered at trial, in order to ascertain what is reasonable in this case, it will be necessary to conduct a further evidentiary hearing. Whatever the amount is ultimately determined to be, however, the defendant bank will be liable for such attorney's fees and the costs of this action.

## PENDENT CLAIM

The plaintiffs invoke our pendent jurisdiction for alleged violations of the Louisiana Unfair Trade Practice and Consumer Protection Act of 1972, LSA–R.S. 51:1401 et seq.[56]

It is the plaintiffs' contention that the issuance of the check by Building Materials,[57] after what was represented to be the recission deadline, constitutes an unfair trade practice, as does the fact that only two days were given within which to rescind.

 In order to prevail on this theory of recovery, however, it must be established that the plaintiffs have suffered a loss of money or movable property and, in order to obtain treble damages, that the unfair trade practice was knowingly used.[58]

We find that the plaintiffs have failed to sustain their burden of proof. Even if we were to hold, which we do not, that the practices complained of were unfair, the evidence does not support a finding that any actual damages were sustained as a result of the alleged unfair practices employed. Accordingly, the plaintiffs' complaint, insofar as it seeks recovery under LSA–R.S. 51:1401 et seq., should be dismissed.[59]

For the foregoing reasons, there will be judgment entered herein in favor of the plaintiffs, Joseph E. Gerasta and Josefina E. Gerasta, and against defendant, Hibernia National Bank, recognizing the plaintiffs' recission of their agreement with Hibernia, without any liability for repayment of the loan, and recognizing their right to a return of the $916.56 which was paid to Hibernia on account of the loan, with interest at the rate of 7% per annum from the date of judgment until paid.

Further, the plaintiffs are entitled to judgment, in their favor and against Hibernia, for costs, reasonable attorney's fees[60] and for the cancellation of the inscription in the public records of the second mortgage, if such an inscription exists.

There will also be judgment, in favor of Building Materials and against the plaintiffs, dismissing the plaintiffs' complaint against it and for costs.

This opinion shall serve as our findings of fact and conclusions of law.

---

**56.** Section 1409, subd. A provides in pertinent part that:

"Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act or practice was knowingly used, after being put on notice by the director or attorney general, the court shall award three times the actual damages sustained."

**57.** *See* Exhibit P–6. The result we reach eliminates the need to determine whether or not we can retain jurisdiction to consider the plaintiffs' state claim against Building Materials, after we have found that it is not subject to the Act.

**58.** *Faris v. Model's Guild,* 297 So.2d 536 (La. App. 4 Cir.), *writ refused,* 302 So.2d 15 (La. 1974).

**59.** The result we reach eliminates the need to consider Building Materials' argument that the passage of federal truth-in-lending legislation supersedes state law on the subject.

**60.** No evidence was offered concerning the amount of attorney's fees recoverable. A finding of such amount must, therefore, await further hearing.

## SUPPLEMENTAL MEMORANDUM OPINION

In our original opinion,[1] we stated that we were unable to make a finding of the amount of attorney's fees recoverable by the plaintiffs because no evidence was offered at trial on this issue.

Counsel for the plaintiffs and defendant, Hibernia National Bank, have now stipulated that "if evidence were adduced in this matter, the Court could find that THREE THOUSAND THREE HUNDRED FIFTY AND NO/100 ($3,350.00) DOLLARS would be a reasonable fee for the plaintiffs' attorney's services in this case."[2]

Accordingly, we find that $3,350.00 is a reasonable fee and plaintiffs are entitled to judgment therefor in addition to the other relief found for plaintiffs.

Judgment will be entered accordingly.

---

1. *See* Record, Document No. 48.

2. *See* Record, Document No. 51