HAROLD H. DORSEY *v.* DONALD A. BEADS EX UX.

[No. 163, September Term, 1979.]

*Decided July 8, 1980.*

---

The cause was argued before SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Thomas F. Stansfield* for appellant.

No brief filed on behalf of appellees.

SMITH, J., delivered the opinion of the Court.

When appellant, Harold H. Dorsey, a Carroll County builder, was not paid the full sum due him for a home he constructed on his lot and then sold to appellees, Donald A.

Beads and Alice Beads, his wife, he persuaded them several months after settlement to execute a mortgage covering this sum and certain other monies said to be due him. They defaulted after making several payments. He instituted a foreclosure action. They countered with a bill of complaint in that proceeding seeking to invalidate and set aside the mortgage and note and to enjoin the foreclosure. Upon grounds of merger, estoppel, and the Federal Truth-In-Lending Act, 15 U.S.C. § 1601 et seq. (the Act), a trial judge ruled in their favor. Dorsey appealed to the Court of Special Appeals. He then petitioned us for the writ of certiorari prior to argument in that court. We granted the petition because we had not previously addressed a case arising under the Act. We disagree with the chancellor on all three grounds upon which he relied. Hence, we shall reverse.

## i. The facts

From about 1951 until just prior to his testimony in this case, Beads was employed by Exxon Corporation. His most recent position there was as a relief foreman. (He had changed jobs just prior to his testimony.) Mrs. Beads is a language arts teacher in the Carroll County schools. They owned their home in Baltimore County but desired a better one. They came in contact with a Baltimore realtor with whom they listed their house for sale. That realtor had had dealings over prior years with Dorsey. Through the realtor the Beads and Dorsey entered into a contract by which he was to build them a home on a site to be purchased by him in Carroll County. The Beads never saw Dorsey until after the house was well under way.

The contract between Dorsey and the Beads was dated January 19, 1975. He agreed to convey certain realty to them after constructing a home "in accordance with attached plans." The purchase price was to be $53,900.00, of which $500.00 was said to have been paid prior to the signing of the contract. The agreement provided for a second payment of $500.00 on June 15. The balance was to be paid at settlement. It was set as on or before August 15, 1975. A

purchase money mortgage was to be procured by the buyers or their agents with certain specified terms. The contract was to be null and void if the mortgage had not been procured by a certain date.

Mortgage financing was arranged, apparently through a block of funds purchased by Dorsey for his customers through a realtor. However, when the Beads' realtor was unable to sell their home prior to the time for settlement, they were unable to meet the requirements of that federally guaranteed loan.

Mrs. Beads was anxious to move into their new home and to have their children entered in the Carroll County schools at the beginning of the school year in September 1975. Two pre-settlement occupancy agreements were entered into between Dorsey and the Beads. The first called for possession on October 8, 1975, with the sum of $13.50 per day to be paid as rental. It recited that the sum of $9,600.00 by way of additional deposit was to be paid. The date of settlement was extended to November 20, 1975. This agreement is on a duplicated form. We are not enlightened as to its author.

On October 20, 1975, what was termed a "Further Pre-Occupancy Agreement" was prepared by Dorsey in longhand on his letterhead. It indicated that it was intended "to clarify monies between the parties." It recited that the original settlement date was August 15, 1975; that when the house was ready for delivery the Beads could not settle; that because Dorsey was losing interest and return on his money he sought security and reimbursement; and that the rental period of August 15 to September 14, 1975, was "exchanged for contract items, deletion of cellar, bath, toilet and sink, and window screens," which "items c[ould] be later added for $400.00." It specified a daily rental fee of $13.50 beginning September 15, 1975, and continuing until the day of settlement. This sum was to be "due monthly." It said that the Beads were to receive "deposit credit of $9,600.00 of which $5,500.00 is paid this date." It specified that the remaining $4,100.00 was "promised to seller & [was] to be paid after sale of [the Beads'] previous residence" on Kevin

Avenue in Baltimore County. This sum was to bear interest at the rate of ten percentum per annum from August 15, 1975, and was to "constitute a third mortgage on that residence." It was stated that the sale of the Kevin Avenue property was "expected shortly." The agreement further said that this $4,100.00 was also to "be a second mortgage against [the] new residence . . . ." Settlement was to take place during the month of November. It was provided that in no circumstance should Dorsey fail to receive the remaining $4,100.00 before December 31, 1975. There were other provisions not relevant to this controversy.

The testimony of Mr. and Mrs. Beads indicates that the sum of $5,500.00 mentioned was in fact paid by their realtor to Dorsey as an advance to them on the sale of their Kevin Avenue home. They did not testify to ever having paid the remaining $4,100.00. Their position is simply that they went to settlement and thus they thought nothing more remained to be paid.

Ultimately, a conventional mortgage was procured through a Baltimore building and loan association. The summary of the transaction with the borrowers as shown on the settlement sheet reflected the contract sale price of $53,900.00 and certain settlement charges bringing the gross amount due from the borrowers to $56,055.40. The borrowers were credited with a mortgage of $45,000.00 plus a "deposit or earnest money" in the amount of $11,100.00 "paid by or in behalf of borrower." It showed $44.60 payable to the Beads, the "borrower."

Dorsey was credited on the settlement sheet with the $53,900.00 purchase price and certain tax adjustments. He was charged with certain settlement charges, the sum necessary to pay off a first mortgage loan to a Westminster bank, and the sum of $11,100.00 as "deposit of purchaser." It reflected a balance due by Dorsey to the settlement attorneys of $433.09.

Dorsey testified that it was necessary that the settlement sheet reflect this $11,100.00 credit or the mortgage loan would not have been obtainable. He said he did this without

receiving any cash from the Beads. He indicated that this sum probably worked out to be what was needed to get through settlement.

The Beads' home on Kevin Avenue was sold and settlement for it took place in March of 1976. The sale price apparently was about $19,000.00. The Beads say they received nothing at settlement. No settlement sheet relative to that transaction is in evidence.

In addition to his regular employment, Mr. Beads did some work for Dorsey. Dorsey said Beads told him that he could not use any of the sums so earned to pay the balance due Dorsey because they had borrowed for carpeting and new furniture. It was necessary to pay the sums thus earned on that loan. Dorsey said he was approached by Mr. Beads after the sale of the Kevin Avenue property when there was no money left from it to pay Dorsey. Beads asked that arrangements be made for them to pay some amount each month on the sum remaining due to Dorsey. Ultimately, the Beads executed a mortgage to Dorsey in the amount of $5,000.00 under date of May 14, 1976. The accompanying note specified that interest was to be at the rate of eight per cent per annum and that consecutive monthly installments of $100.00 were to be paid. An amortization schedule was provided. It is not disputed that this mortgage is in default.

It is impossible to reconcile the account between the parties on the basis of this record, nor are we required to do so. Dorsey says, and the Beads do not dispute him, that the only sum paid him directly by them was $500.00. He further states that the only other sum received by him from or on behalf of the Beads prior to settlement was the amount of $5,500.00 advanced by their realtor. Dorsey says no money was paid to him at settlement nor were any sums paid on his behalf other than that which came from the mortgage made by the Beads. The settlement sheet reflects payment on behalf of Dorsey of $40,501.65 to a Westminster bank and payment of certain settlement charges, including a commission of $2,695.00 to the realtor. Rent for the 148 day period from September 15, 1975, to settlement on February 10, 1976, at $13.50 per day works out to $1,998.00. No

mention of rent appears on the settlement sheet. Dorsey says no rent has ever been paid to him by or on behalf of the Beads.

Dorsey testified that never prior to this had there been a case where he had constructed and then sold a home and had left the settlement table with money yet due him. He said this had occurred in a small percentage of instances since the settlement here. He further testified that never before this had he taken back a purchase money mortgage, nor has he taken any since then.

Dorsey said he does not get involved in procuring financing in the instances where he builds and sells a home. This is done by a realtor. In advance of this transaction, however, as previously indicated, because of the then tight money market, he had paid a realtor a certain amount of money to procure funds to be reserved for financing Dorsey's sales. The ultimate mortgage loan to the Beads did not come from that source. Dorsey said he has never been paid any fee for financing any transactions on behalf of his purchasers.

### ii. The proceedings in the circuit court

Dorsey assigned the mortgage to his attorney for foreclosure and collection. Thereupon the Beads filed a bill of complaint seeking to invalidate and set aside that mortgage and promissory note. They sought and obtained an ex parte injunction prohibiting the sale pending determination of the case on its merits.

The bill recited the contract of sale and the purchase price specified therein; the settlement, "at which time [, it said,] the purchase price was paid in full . . ."; execution of the deed at settlement; their taking possession prior to settlement; that on or about May 14, 1976, Dorsey came to their home stating that he had not been able to collect about $5,000.00 "owed him from the realtor involved in the transaction," that he desired that they pay him this sum, and then presented to them the note, the loan disclosure statement, and an agreement as to the contractual rate of interest; that

he advised them "that they were required to pay him the monies which he demanded and he further required them to execute" the various documents including the second mortgage; that they executed the instruments and began making payment on the note and mortgage "under the mistaken belief that they were liable to Defendant, Harold H. Dorsey"; that they stopped making payments in January of 1978; that the mortgage was assigned for foreclosure and sale had been scheduled; that there was no consideration for the mortgage and note; that they were not indebted "for any monies whatsoever under the mortgage or otherwise"; that Dorsey fraudulently induced them to execute the mortgage and note by telling them that they were liable for these sums "when in fact . . . at the time he made said representations he knew that they were not liable and he did not disclose the facts of the matter to the Plaintiffs concerning who was liable to him for said monies"; that he failed to comply with Maryland Code (1975) § 12-401 et seq., Commercial Law Article, concerning secondary mortgage loans; that Dorsey "failed to advise the [Beads] that they had the right of recission with regard to the Note and Mortgage which they executed"; and various other items not here relevant.

The allegation of the Beads relative to § 12-401 et seq. of the Commercial Law Article concerning secondary mortgage loans was held to be without foundation. No cross-appeal on that point was filed.

The Beads contended that under the Act Dorsey was a creditor as defined in the statute, the chancellor said, "We 1635 to disclose to the Beads their right of recission under the Act; and that since this was not done the Beads were not obligated to Dorsey, the bill of complaint having amounted to notice of intent to rescind.

In response to Dorsey's contention that he was not a creditor as defined in the statute, the chancellor said,"We believe he has misconstrued that definition." He went on to say, after quoting from the Act and from *Eby v. Reb Realty, Inc.,* 495 F.2d 646 (9th Cir. 1974):

The credit extended by Dorsey to the Beads was

not an isolated instance. Dorsey, in our opinion, is clearly at least an arranger of credit and as such was required to comply with 15 U.S.C. § 1601, *et seq.* when he extended credit to the Beads.

He found the bill of complaint to be sufficient notice under § 1635 (a) of recission by the Beads. We need not decide this latter point.

The trial judge also rested his decision upon the established principle of law that a deed made in full execution of a contract of sale of land merges the provisions of the contract therein, including all prior negotiations and agreements leading up to the execution of the deed, becoming the final and exclusive agreement between the parties by which their rights are to be determined. Under this he held that Dorsey could not be heard to contend that the mortgage represented a sum still due him since this would be "inconsistent with the deed and . . . would tend to contradict it." He pointed out, "There is nothing in the contract of sale that would indicate any agreement that the terms of the contract made prior to the deed were to survive the execution of the deed."

Finally, he held "that Mr. Dorsey, having misled the lending institution and the settlement attorneys as to the actual down payment made by the Beads, is now estopped to assert a claim inconsistent with his previous action."

### iii. Merger

The deed here recited $5.00 and other good and valuable considerations. It did not say, as many deeds do, "the receipt whereof is hereby acknowledged . . . ." [1]

---

**1.** The instrument here was executed prior to the enactment of Chapter 462 of the Acts of 1978, now codified as Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.) Art. 81, § 277 (b) (3), requiring, for purposes of the recordation tax, that a deed state "the amount of the actual consideration paid or to be paid . . . as part of its recitals or as part of the acknowledgement" or that such information "be contained in a separate affidavit accompanying the instrument, signed under the penalties of perjury by a party to the instrument or the agent of the party."

The definitive case in Maryland on the parol evidence rule, with which the doctrine of merger is intertwined, is *Rinaudo v. Bloom,* 209 Md. 1, 120 A.2d 184 (1956). There Chief Judge Brune said for the Court, "[T]he consideration stated in a deed may usually be contradicted and the true consideration may be shown by parol. *Koogle v. Cline,* 110 Md. 587, 73 A. 672 [(1909)]." *Id.* at 8. The cited case does indeed so hold.

In *Barrie v. Abate,* 209 Md. 578, 121 A.2d 862 (1956), cited by the chancellor, Judge Delaplaine said for the Court:

> It is an accepted rule that a *prima facie* presumption arises from the acceptance of a deed that it is an execution of the entire agreement for the sale of the realty, and the rights of the parties in relation to the agreement are to be determined by the deed. However, parol evidence may be given of collateral facts relating to an agreement for the sale of realty, even though a deed has been executed, if the facts are consistent with the deed and do not tend to contradict it. *Stevens v. Milestone,* 190 Md. 61, 65, 57 A.2d 292 [(1948)]; *Edison Realty Co. v. Bauernschub,* 191 Md. 451, 458, 62 A.2d 354 [(1948)]. [*Id.* at 582-83.]

The rule is stated in 4 H. Tiffany, *Law of Real Property* (3d ed. 1975) § 981.05:

> The general rule is that a deed includes all prior negotiations and agreements leading up to its execution and delivery, so that a merger is thereby effected. However, such rule does not apply to real estate contract provisions or other matters not performed or consummated by delivery and acceptance of the deed. In other words, collateral agreements or conditions not incorporated in the deed or inconsistent therewith are not merged in the deed. Generally, contract provisions as to title, possession, quantity or emblements of land are conclusively presumed to be merged into the subsequently delivered and accepted deed, even

though the contract and deed vary. The rule of merger is, of course, subject to avoidance when the defenses of fraud and mistake are properly invoked. [*Id.* at 118-19.]

By way of further explanation, in 8A G. Thompson, *Law of Real Property* (Grimes Repl. 1963) § 4458 at 334, citing *Woollen v. Hillen,* 9 Gill 185 (1850), it is observed, "Contractual provisions as to the payment of the purchase price are not merged with the deed and may subsequently be shown by evidence dehors the deed."

The merger doctrine does not bar enforcement of Dorsey's mortgage.

### iv. Estoppel

For principles of estoppel to be applicable, the party claiming the benefit of the estoppel must have been misled to his injury and must have changed his position for the worse, having believed and relied upon the representations of the party sought to be estopped. *Neuman v. Travelers Indemnity Co.,* 271 Md. 636, 654, 319 A.2d 522 (1974); *Lusby v. First Nat'l Bank,* 263 Md. 492, 505, 283 A.2d 570 (1971); and *Savonis v. Burke,* 241 Md. 316, 319, 216 A.2d 521 (1966). There is not the slightest implication here that the Beads in any way have been misled to their injury or that they changed their position for the worse, having believed and relied upon the representations of the party sought to be estopped. Hence, this ground of the trial judge's opinion likewise must fall.

### v. Truth-In-Lending

The Act is a part of the Consumer Protection Act, Pub. L. No. 90-321. Its purpose, as stated in 15 U.S.C. § 1601, is to promote the informed use of credit by providing for "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." One of the things which must be disclosed is the substantive right of recission provided in § 1635 (a).

The object of this and similar acts is said by Boyd, *The Federal Consumer Credit Protection Act — A Consumer Perspective,* 45 Notre Dame Lawyer 171 (1970), to be "to relieve consumers who, as a result of high-pressure tactics by door-to-door salesmen, have incurred obligations they otherwise would have avoided." *Id.* at 188. The three-day right of recission, however, granted in § 1635 (a) is tolled if the creditor fails to disclose the right of recission. In such instance it expires three years after the date of consummation of the transaction. 15 U.S.C. § 1635 (f).

The Act is a remedial statute and should be construed liberally in favor of the consumer in order to effectuate the congressional purpose. *Eby v. Reb Realty, Inc.,* 495 F.2d 646, 650 (9th Cir. 1974). It is not to be construed so liberally or loosely, however, as to lose sight of the balance which Congress sought to strike between borrowers and lenders. *Downey v. Whaley-Lamb Ford Sales, Inc.,* 607 F.2d 1093, 1095 (5th Cir. 1979).

The Act provides in § 1604 that the Federal Reserve Board "shall prescribe regulations to carry out the purposes" of the Act. It has done so by regulations popularly termed "Regulation Z" and codified at 12 C.F.R. Part 226. It has further clarified the Act by issuing various interpretive rulings and public information letters in response to inquiries by citizens.

The Act provides in § 1602:

> (f) The term "creditor" refers only to creditors who *regularly* extend, or arrange for the extension of, credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise. [Emphasis added.] [2]

---

2. By its enactment of Title VI of the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, § 602(a), 94 Stat. 168 (1980), Congress amended the definition of "creditor" for the Truth-in-Lending purposes. The Act as it existed at the time of the transactions here in question, of course, controls in this case.

Regulation Z (12 C.F.R. § 226.2 (s)) states in pertinent part relative to the term "creditor":

> (s) "Creditor" means a person who in the ordinary course of business regularly extends or arranges for the extension of consumer credit, or offers to extend or arrange for the extension of such credit, which is payable by agreement in more than four instalments, or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise.

The term "arrange for the extension of credit" is also defined in pertinent part:

> (h) "Arrange for the extension of credit ..." means to provide or offer to provide consumer credit ... which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit ...
>
> (1) Receives or will receive a fee, compensation, or other consideration for such service, or
>
> (2) Has knowledge of the credit ... terms *and* participates in the preparation of the contract documents required in connection with the extension of credit .... [12 C.F.R. § 226.2 (h) (emphasis added).]

This latter definition of "arranger" has been noted as being somewhat problematic in the sense that it is not clear whether an "incidental" arranger, such as a real estate broker who refers his customers to a lending institution should be held to be an "arranger" along with "professional" arrangers, such as loan brokers. The problem is discussed by Professor Landers in *The Scope of Coverage of the Truth in Lending Act,* 1976 A.B.F. Research Jnl. 565, 576-78 (1976). The cases and staff opinions of the Federal Reserve Board, however, almost without exception have applied the rule mechanically: one is an "arranger" of credit only if he

receives a fee for his arranging *or* has knowledge of the credit terms *and* participates in the preparation of the contract documents. On one hand, as the court indicated in *Childress v. Mobile Living Corporation,* 386 F. Supp. 903, 905 (E.D. La. 1974), acceptance of a fee renders one an arranger of credit even if he did not participate in the preparation of the credit documents and regardless of whether the fee was paid by the lender or the borrower. On the other hand, as indicated by the courts in *Manning v. Princeton Consumer Discount Co., Inc.,* 390 F. Supp. 320, 325 (E.D. Pa. 1975), and *Gerasta v. Hibernia Nat. Bank,* 411 F. Supp. 176, 186 (E.D. La. 1975), *rev'd in part on other grounds,* 575 F.2d 580 (5th Cir. 1978), participation in the preparation of contract documents *and* knowledge of its terms, even without acceptance of a fee for the service, makes one an arranger. In fact, a fee was involved in *Manning,* having been paid by an automobile dealer to a financer. However, no fee was involved in *Gerasta* which involved the relationship between a home improvement financer and a bank which was held to be an extender of credit under the Act. This construction of Regulation Z is endorsed by Warren and Larmore, *Truth in Lending: Problems of Coverage,* 24 Stanford L.R. 793, 825 (1972). Moreover, the Federal Reserve Board staff opinions clearly adopt this approach. *See, e.g.,* Federal Reserve Letter No. 158, [1969-1974 Transfer Binder] *Cons. Cred. Guide* (CCH) ¶ 30,497 (October 16, 1969):

> You indicated that the builder may assist the prospective purchaser in preparing a loan application and in initiating a credit report, all in connection with first mortgage credit to be extended by a party other than the builder. However, the builder does not become involved in the preparation of the contract documents (note, mortgage, etc.) even though he may be aware of the credit terms. You questioned whether such involvement by the builder placed him within the definition of a creditor under the terms of "participates in the preparation of the contract documents required in connection with the extension of credit."

Merely providing a prospective purchaser assistance in completing a loan application and initiating a credit report would not, in itself, place the builder within the definition of the creditor and, therefore, subject him to the disclosure requirements of Regulation Z. Of course, if he were to receive a fee for his assistance in the credit transaction, he would fall within the definition of a creditor.

*See also:* Federal Reserve Letters No. 1283, 5 *Cons. Cred. Guide* (CCH) ¶ 31,774 (February 21, 1978); No. 778, [1974-1977 Transfer Binder] *Cons. Cred. Guide* (CCH) ¶ 31,100 (April 10, 1974); No. 661, [1969-1974 Transfer Binder] *Cons. Cred. Guide* (CCH) ¶ 30,932 (January 10, 1973); No. 344, [1969-1974 Transfer Binder] *Cons. Cred. Guide* (CCH) ¶ 30,399 (June 4, 1970); No. 124, [1969-1974 Transfer Binder] *Cons. Cred. Guide* (CCH) ¶ 30,475 (September 25, 1969). The fact that Dorsey may have received intangible business benefits from his purchase of funds in the form of a higher marketability of the homes which he built does not make him an arranger of credit absent his receipt of a fee or his knowledge of the credit terms and participation in the preparation of the contract documents. *Gerasta,* 411 F. Supp. at 186-87; *Munson v. Orrin E. Thompson Homes, Inc.,* 395 F. Supp. 152, 160-61 (D. Minn. 1974); Federal Reserve Letter No. 301, [1969-1974 Transfer Binder] *Cons. Cred. Guide* (CCH) ¶ 30,347 (April 16, 1970).

We discussed the rules for statutory construction in *Police Comm'r v. Dowling,* 281 Md. 412, 379 A.2d 1007 (1977). A number of cases were cited for each of the statements there made. That which is pertinent to the case at bar includes:

The cardinal rule of statutory construction is to ascertain and carry out the real legislative intent. In determining that intent the Court considers the language of an enactment in its natural and ordinary signification. . . . A corollary to this rule is that if there is no ambiguity or obscurity in the

> language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly. . . . A court may not insert or omit words to make a statute express an intention not evidenced in its original form. . . . The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law. . . . Absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory. . . . [*Id.* at 418-19].

*See also Messitte v. Colonial Mortgage Serv.,* 287 Md. 289, 293-94, 411 A.2d 1051 (1980), and cases there cited. In *Messitte* we said, "We know of no reason why any other rule should be used for the interpretation of regulations of an administrative agency," giving appropriate references. *Id* at 293. Accordingly, using those rules, we turn to an evaluation of the facts here under the Act and Regulation Z.

It must be borne in mind that the burden of proof here was on the Beads who brought the action. Also, whether Dorsey is a creditor within the meaning of the Act must be determined upon the basis of facts occurring prior to and at the time of the execution of the mortgage, not upon the basis of any transactions in which Dorsey has been involved since the time of execution of the mortgage. The undisputed evidence is that this was the only instance in which Dorsey himself extended credit up to the time of this transaction; that Dorsey did not obtain financing for his customers but referred them to realtors; that prior to this transaction Dorsey had arranged through a realtor for funds to be available for his customers, paying a fee in connection with such funds, but it still was necessary for his customers to satisfy the credit requirements of such lenders; that Dorsey never received any compensation from any lender or from any customer for loans made to Dorsey's customers; and that Dorsey at no time participated in the preparation of the

contract documents required in connection with loans to his customers.

For one to be a creditor the Act requires that he *"regularly* extend, or arrange for the extension of, credit . . . ." (Emphasis added.) This has been interpreted through Regulation Z as meaning "a person who in the ordinary course of business regularly extends or arranges for the extension of consumer credit, or offers to extend or arrange for the extension of such credit . . . ." In reporting the original Truth-in-Lending bill, the Committee on Banking and Currency of the House of Representatives emphasized that the term was intended to "[c]over[] only those who regularly engage in credit transactions. Thus a small retailer who extended credit and charged for it in an isolated instance to accommodate a particular customer would not be covered." H.R. Rep. No. 1040, 90th Cong., 1st Sess. 23-24 (1967). Our cases tell us that "[t]he word 'regularly' ordinarily implies uniformity, continuity, consistency, and method, and excludes the idea of an occasional, accidental, incidental or casual use . . . ." *Carter v. Reardon-Smith Line,* 148 Md. 545, 558, 129 A. 839 (1925). Dorsey in the ordinary course of his business does not regularly extend consumer credit. *Compare Eby v. Reb Realty, Inc.,* 495 F.2d 646 (9th Cir. 1974), and *James v. Ragin,* 432 F. Supp. 887 (W.D.N.C. 1977). It is further provided that the term "arrange for the extension of credit" means that to be an arranger one must either "receive a fee, compensation, or other consideration for such service, *or*[h]a[ve] knowledge of the credit . . . terms *and* participate[] in the preparation of the contract documents required in connection with the extension of credit . . . ." (Emphasis added.) Dorsey received no fee, compensation or other consideration for extension of credit. Thus, he does not meet the test of the first prong. He does not in the ordinary course of business regularly participate in the preparation of contract documents for the extension of credit. Hence, he is not covered by the second prong relative to an arranger of credit.

Since the evidence here does not place Dorsey within these definitions, the Act is not applicable and the mortgage is valid.

> *Judgment reversed; appellees to pay the costs.*