479 A.2d 363

**BOARD OF EXAMINERS IN OPTOMETRY et al.**

v.

**Richard SPITZ, Jr.**

**No. 26, Sept. Term, 1983.**

Court of Appeals of Maryland.

Aug. 20, 1984.

Susan K. Gauvey, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen. and Jack C. Tranter, Sp. Asst. Atty. Gen., Baltimore, on the brief), for appellants.

Gary I. Strausberg and M. Albert Figinski, Baltimore (Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

COLE, Judge.

The basic question we are asked to decide in this case is whether the activities of an optician in fitting contact lenses constitute the practice of optometry and is therefore prohibited by statute in this State.

The issue arose as a result of a suit for declaratory and injunctive relief filed by the Board of Examiners in Optometry of the State of Maryland and Arthur A. Marshall, Jr., the State's Attorney for Prince George's County (hereinafter referred to jointly as the Board) against Richard Spitz, Jr., claiming that Spitz was engaged in the unlawful practice of optometry. The Circuit Court for Prince George's County heard the complaint and rendered its decision, ordering that Spitz

be and is hereby enjoined from directly or indirectly engaging in the practice of optometry or ophthalmology as hereinbefore indicated. Except when acting under the direct professional supervision of a qualified ophthalmologist or optometrist the Respondent may not use his independent judgment, discretion, or any information not

obtained directly from standard measurements and standard tables to determine curvatures, powers, thicknesses, or the optical characteristics of contact lenses.

The Board appealed and Spitz noted a cross-appeal. Jointly the parties petitioned this Court for a writ of certiorari which we granted.

To place the issue in proper focus we summarize the facts as found by the trial court.

Spitz is an optician who fits contact lenses. He was trained at a Florida laboratory and, in addition to working as an optician, he teaches contact lens fitting to residents in ophthalmology at Maryland General Hospital. Spitz does not fit a customer with contact lenses unless he first has a prescription for contact lenses from a physician. This prescription must contain the refractive power that would be necessary to correct the customer's vision if eyeglasses were worn and indicate that the physician has approved contact lenses for the patient.

The fitting process used by Spitz may be divided into two phases: the lens selection and the assessment and adjustment of the lenses that have been selected. In selecting the lenses, Spitz begins by using a keratometer (an optical instrument through which the cornea can be viewed) to determine the vertical and horizontal shape of each cornea (the transparent part of the external coat of the eye covering the iris and the pupil). By adjusting this device, Spitz obtains measurements reflecting the surface curvature of the central area of the cornea. If the horizontal and vertical readings are the same, the cornea is spherical in shape. If the two readings differ, the cornea is aspherical and the customer has an astigmatism (an aberration of the optical system in which the image of a point is spread out and one's vision is blurred). Spitz then will determine what

type of lens the customer will receive and formulate the specifications for the lenses.[1]

There are two basic methods of determining these specifications: (1) the measurements and standards method (where measurements of various aspects of each eye are taken with the keratometer and millimeter ruler, and these measurements are related to standard tables or norms); and (2) the trial lens or diagnostic lens method (where a series of lenses with known specifications are tested on the patient's eye until the best fit is produced by systematic trial and error). A combination of the two methods also is used whereby the information from the keratometer and ruler measurements is used to select the initial diagnostic lens; after the initial lens is chosen, additional diagnostic lenses are compared with that initial lens. Spitz uses primarily the measurement and standards technique, although on occasion he does use a combination of the two methods.

In fitting the contact lenses, several variables must be considered. For instance, the ophthalmologist generally will write a prescription based on spectacle lens power. This must be converted to the exact contact lens power by using standard tables and some general rules which are effective in most, but not all, cases. If, as often occurs, the central curvature of the cornea is not spherical, then the lens does not always fit according to the keratometric readings and some judgment is involved in converting spectacle power to contact lens power.

The base curve (a posterior optical zone radius) corresponds to the optic zone of the lens and ideally is parallel to the curve of the central optical section of the cornea. If the central cornea is aspherical some judgment must be exer-

---

1. If the physician has not specified the type of lens to be fitted, Spitz uses the keratometric readings to determine whether any type of lens is contraindicated. [Soft lenses may not generally be used if the customer has a certain amount of astigmatism.] If no lens is contraindicated, the customer determines the type of lens he will receive.

cised in determining the base curve from the keratometric readings.

Selecting the number of peripheral curves—whether the lens is to be a bi-curve or tri-curve lens—and the radius of the curves is to an extent arbitrary, although most fitters follow certain general rules. Spitz testified that he uses standard tables in determining the number of peripheral curves and the radius of the peripheral curve. Also, specification of the blend (the type of junction between two adjacent zones—usually the junction between the base curve and peripheral curve) is rather arbitrary.

Three measurements are important in determining the lens diameter; a vertical measurement using a metric ruler from the lower lid to the upper lid, a horizontal measurement of visible horizontal iris diameter, and keratometric measurements on the assumption that lenses for steeper corneas are smaller and lenses for flatter corneas are larger. Other factors might affect lens diameter. For example, some authorities feel that lid tension should be considered. If the lids are loose, then a larger than normal lens is required.

Finally, center thickness is an important dimension. If the lens is too thin, it will be too flexible and unstable and could warp on the eye; if the lens is too thick, it will be too heavy and will not fit properly. The correct thickness is based partly on the power, partly on the geometry of the lens, and partly on the lens material. Often the calculations of lens thickness are left to the laboratory and, if so, the manufacturer will follow its own recommended thickness table. Spitz testified that he determines the thickness of lenses by using standards supplied by the manufacturer.

The assessment and adjustment phase commences after the initial lenses have been obtained by the fitter. At the customer's second visit, Spitz inserts the first lens in one of the person's eyes and, after instruction, the customer inserts the second lens. Spitz then determines whether the contact lenses fit properly. He introduces fluorescein dye

(a nonharmful vegetable derivative) into the eye and, after it mixes with the tears, he views the tear flow between the lens and the corneal tissue by using a Burton lamp (which produces ultraviolet light that fluoresces the dye). The purpose of the procedure is to determine that there is sufficient tear flow between the lens and the corneal tissue to provide the cornea with adequate oxygen and nutrients and to dispose of metabolic wastes.

If the contact lens is not fitting properly, Spitz will make certain adjustments. For instance, he might find it necessary to modify the base curve of the lens, making that portion of the lens covering the optical zone of the cornea either flatter or steeper. Such changes cannot be made to this initial lens; thus, a new lens with the new base curve must be substituted. In that case, the lenses are no longer fit based solely on the keratometric readings—"on k." [2]

After making any necessary changes in the lenses, Spitz gives the customer detailed instructions on how to insert, remove, and care for the lenses and sets up a wearing schedule for the customer. In one week the customer returns for the third visit. Spitz again will examine the eye with the dye and Burton lamp; however, he also will use a slit-lamp, or biomicroscope, to view the corneas. This device is a horizontal microscope used to detect whether the contact lens has affected the tear flow to the cornea. It also will reveal whether the lens has caused a pathological or harmful condition in the eye. If such a condition is detected, Spitz will send the customer back to the referring physician.

At the fourth visit, Spitz again will use all these procedures to assure there is a proper fit. He also will use the keratometer to determine whether the lenses have caused any changes in the shape of the corneas. Subsequent visits

**2.** Spitz testified that 99% of his customers are fit on k; however, an optometrist stated that he fits very few customers on k. Two other opticians testified that 90% of their customers were successfully fit with the first set of lenses.

are scheduled (at least four) until Spitz is satisfied with the fit. He then refers the customer back to the physician.

Because the arguments of the parties revolve around certain provisions of the Maryland Code, we set forth the relevant provisions of the Health Occupations Article (1981) as follows:

Section 10–101

(f) *Practice optometry.*—"Practice optometry" means:

(1) To use any means known in the science of optics, except drugs, medicine, or surgery:

(i) To detect any optical or diseased condition in the human eye; or

(ii) To prescribe eyeglasses or lenses to correct any optical condition in the human eye;

(2) To give advice or direction on the fitness or adaptation of eyeglasses or lenses to any individual for the correction or relief of a condition for which eyeglasses or lenses are worn; or

(3) To use or permit the use of any instrument, test card, test type, test eyeglasses, test lenses, or other device to aid in choosing eyeglasses or lenses for an individual to wear.

Section 10–102. Scope of title.

(a) *In general.*—This title does not limit the right of an individual to practice a health occupation that the individual is authorized to practice under this article.

(b) *Specific additional exemptions.*—This title does not affect the right of:

(1) An optician to provide glasses on the prescription of a licensed optometrist or a physician who is authorized to practice medicine under Title 14 of this article; or

(2) A dealer to sell eyeglasses or lenses if the dealer does not practice or claim to practice optometry.

Section 10–301. License required; exception.

(a) *In general.*—Except as otherwise provided in this title, an individual shall be licensed by the Board before the individual may practice optometry in this State.

(b) *Exception.*—This section does not apply to a student while participating in a residency training program under the direct supervision of a licensed optometrist. Section 10–501. Practicing without license.

Except as otherwise provided in this title, a person may not practice, attempt to practice, or offer to practice optometry in this State unless licensed by the Board.

The Board argues that these provisions prohibit Spitz from fitting contact lenses. It maintains that because Spitz is not provided with a proper contact lens prescription detailing all necessary variables, he must make his own measurements and assessments in formulating lenses and "[i]n so doing, he is both prescribing lenses to correct an optical condition and using instruments or devices to aid in the choice of lenses for an individual to wear in violation of Maryland law." The Board insists that permitting Spitz and other opticians to do anything more than fill a prescription which defines all requisite aspects of the lenses violates the language and purpose of the Act.

Spitz counters by claiming that the statute does not preclude him from performing any of the functions incident to fitting contact lenses. Furthermore, he maintains that the statute cannot be read to cover his situation. When the optometry statute was enacted contact lenses were little known and seldom used. Since the practice of opticians fitting contact lenses has grown and developed, the legislature, though being requested on numerous occasions to place the fitting of contact lenses under the aegis of optometry, has declined to do so. In addition, Spitz says the Attorney General has indicated that the services performed by an optician are not prohibited by the optometry statute.

The trial court considered both of these arguments and steered a course between them, concluding that Spitz could not engage in acts requiring the exercise of his independent judgment or discretion but that he could perform purely mechanical operations in fitting contact lenses. The court concluded that the optometry statute was ambiguous be-

cause it did not specifically refer to contact lenses and because contact lenses were virtually unknown when the statute was enacted in 1914.

Our task is clear, we must determine if Spitz is practicing optometry. We, therefore, turn to examine the statute. In *Ryder Truck Lines v. Kennedy*, 296 Md. 528, 535–36, 463 A.2d 850 (1983), we said recently:

We have repeated time and again that the cardinal principle of statutory construction is to determine the legislative intent. To do this we look first to the language in the statute. If it is clear, then we need look no further. *See Utt v. State*, 293 Md. 271, 443 A.2d 582 (1982); *Vallario v. State Roads Comm'n*, 290 Md. 2, 426 A.2d 1384 (1981); *Briggs v. State*, 289 Md. 23, 421 A.2d 1369 (1980); *Department of Public Safety v. LeVan*, 288 Md. 533, 419 A.2d 1052 (1980); *Dorsey v. Beads*, 288 Md. 161, 416 A.2d 739 (1980); *State v. Berry*, 287 Md. 491, 413 A.2d 557 (1980); *Messitte v. Colonia Mortgage Serv.*, 287 Md. 289, 411 A.2d 1051 (1980); *Board v. Stephans*, 286 Md. 384, 408 A.2d 1017 (1979); *Harbor Island Marina v. Calvert Co.*, 286 Md. 303, 407 A.2d 738 (1979); *Mauzy v. Hornbeck*, 285 Md. 84, 400 A.2d 1091 (1979); *Massage Parlors, Inc. v. City of Balto.*, 284 Md. 490, 398 A.2d 52 (1979); *Balto. Gas & Elec. Co. v. Board*, 278 Md. 26, 358 A.2d 241 (1976); *Baltimore County v. White*, 235 Md. 212, 201 A.2d 358 (1964). If it is unclear and ambiguous, we seek other aids in uncovering the legislative intent or in recognizing the legislative purpose. *See Bledsoe v. Bledsoe*, 294 Md. 183, 448 A.2d 353 (1982); *Briggs v. State, supra; State v. Berry, supra; Brown v. Brown*, 287 Md. 273, 412 A.2d 396 (1980); *Fairchild v. Maritime Air Serv.*, 274 Md. 181, 333 A.2d 313 (1975); *Gatewood v. State*, 244 Md. 609, 224 A.2d 677 (1966); *Walker v. Montgomery County*, 244 Md. 98, 223 A.2d 181 (1966); *Truitt v. Board of Public Works*, 243 Md. 375, 221 A.2d 370 (1966); *Md. Medical Service v. Carver*, 238 Md. 466, 209 A.2d 582 (1965).

Our reading of § 10–101(f) is not helpful. That section refers only to eyeglasses or lenses. Section 10–102(b)(1) creates more confusion because it exempts opticians who "provide glasses on the prescription of a licensed optometrist or a physician." Neither section specifically refers to contact lenses. We cannot conclude, therefore, from the use in the statute of eyeglasses, lenses, or glasses that the legislature intended to include "contact lenses." We turn then to other techniques to discover the meaning of the statute.

We have said that examination of a statute's purpose may prove a useful interpretive tool. *See Ryder Truck Lines v. Kennedy, supra.* We considered the purpose of the optometry statute in *Dvorine v. Castelberg Corp.*, 170 Md. 661, 185 A. 562 (1936). In that case Castelberg Jewelry maintained a department for the sale of eyeglasses and employed an optometrist to provide this service. The Board of Optometrists, its individual members, and an optometric association brought suit to enjoin Castelberg from engaging in the practice of optometry. Thus, the Court was faced with determining whether the statute barred the corporation from "practicing optometry" even though the actual work was performed by a licensed optometrist. The Court stated:

> Manifestly that purpose was not to protect the financial interests of persons engaged in the practice of optometry, but to protect the public against injury or harm which might result if ignorant, unskillful, or incompetent persons were permitted to offer their services as optometrists indiscriminately to all who might apply to them for aid in correcting errors in vision. [*Id.* at 669, 185 A. 562.]

However, *Dvorine* does not provide us with a complete analysis of the statute's purpose, because other provisions are involved in this case that were not considered there. Here we must consider not only the § 10–101(f) definition of optometry, but also § 10–102(b), which exempts opticians providing glasses from the prohibitions of the statute.

When this statute was drafted (1914), contact lenses were used very rarely, and opticians were in the business of dispensing glasses. The statute precluded opticians from diagnosing or treating conditions of the eye, but permitted opticians to continue filling prescriptions for glasses. As the demand for contact lenses increased ophthalmologists sought the assistance of opticians in developing and fitting contact lenses on their patients.[3] By 1948 fitting contact lenses apparently became an integral part of the business of opticians and continues so today. We find in the record no empirical evidence that even suggests that the presence of opticians in this field has created any risk to the public and we conclude that the purpose of the statute has not been thwarted because opticians fitted contact lenses.

Our conclusion is buttressed by an Attorney General's opinion which states that opticians may fit contact lenses. While the opinion of the Attorney General interpreting legislation is not binding on this Court, nevertheless it is entitled to careful consideration. In 1976, the Attorney General in response to a request by the Honorable Craig S. Knoll, a member of the Maryland House of Delegates, issued an opinion as to whether opticians were permitted to fit contact lenses. *See* 61 *Op.Att'y Gen.* 630 (1976). There the Attorney General stated that "it is our opinion that the fitting of contact lenses by opticians pursuant to a proper contact lens prescription is not illegal in Maryland and would not subject an optician to criminal penalties for practicing optometry without a license." *Id.* at 637. This opinion takes on added significance in light of subsequent action by the legislature.

---

**3.** In response to questioning regarding how his practice began, Mr. King (a Baltimore optician) stated:

A. It started because the number of eye physicians wanted Bowen & King to fit contact lenses for people they couldn't take care of any other way with their vision. It wasn't cosmetic reasons, it was usually for keratoconus cases or corneal scars.

Q. We are talking about thirteen years back from 1946, and if my subtraction is correct it would be about 1933, is that correct?

A. That's correct.

In 1977, the legislature repealed and reenacted the optometry code. 1977 Md.Laws, ch. 431. This legislation was not merely a recodification of these provisions, which did occur in 1981, but was done "for the purpose of revising the provisions relating to optometry by defining certain terms." *Id.* at Preamble. However, the definition of the practice of optometry was not changed.

The legislature is presumed to be aware of the Attorney General's opinion. The opinion had been requested by one of its members and furthermore, the legislative files from 1977 contain a letter addressed to the Honorable Harry J. McGuirk, Chairman of the Economic Affairs Committee of the Senate, specifically directing his attention to the opinion. It would appear to us that if the legislature disagreed with the Attorney General's opinion that opticians could lawfully fit contact lenses, they would have amended the statute.

In *Valentine v. Board of License Comm'rs*, 291 Md. 523, 435 A.2d 459 (1981), the Court most recently acknowledged the significance of an opinion by the Attorney General. The Court noted that:

"[W]hile courts are not bound by an Attorney General's opinion, or an administrative construction in conformity therewith, yet, when the meaning of the legislative language is not entirely clear, such legal interpretation and administrative construction should be given great consideration in determining the legislative intent. The Legislature knew, or must be presumed to have known, of this interpretation and administrative construction at the time of the passage of the act of 1933, and must be held to have employed the language it did with that interpretation in view." [*Id.* at 534 [435 A.2d 459] (quoting *Read Drug & Chemical Co. v. Claypoole*, 165 Md. 250, 257–58, 166 A. 742, 745 (1933).]

In other cases we have commented specifically on the effect of legislative reenactment without change in a particular provision after the Attorney General has issued an

opinion regarding the impact of that provision. In *Twin-brook Swim. Pool v. Comptroller,* 274 Md. 88, 333 A.2d 49 (1975), the Attorney General had on two occasions considered the question presented—whether club dues were subject to an admission tax. The Court concluded: "In reenacting the statute during the years which have intervened, the General Assembly has impliedly acquiesced in the correctness of the construction placed on it by the Attorney General." *Id.* at 94–95, 333 A.2d 49. *See also Demory Brothers v. Bd. of Pub. Works,* 273 Md. 320, 329 A.2d 674 (1974); *Crest Investment v. Cohen,* 245 Md. 639, 227 A.2d 8 (1967); *Benco Vending v. Comptroller,* 244 Md. 377, 223 A.2d 759 (1966); *Mitchell v. Register of Wills,* 227 Md. 305, 176 A.2d 763 (1962).

The lower court rejected this legislative acquiescence argument because the reenactment and later recodification made no substantive changes and because the opinion noted that there was substantial contrary authority and that legislative clarification was necessary. However, such arguments fail to perceive the real significance of the legislative acquiescence theory. The Attorney General published an authoritative opinion interpreting the statute to allow opticians to fit contact lenses and, although the legislature reenacted this statute, they did not alter it to change the status quo. *See, e.g.,* 1965 Session—H.B. 959; 1974 Session —S.B. 721; 1975 Session—S.B. 845 (each of these proposed to include fitting contact lenses within the practice of optometry); 1977 Session—H.B. 38 (to require opticians desiring to fit contact lenses to be examined and licensed by the Board of Examiners of Optometry); 1978 Session—H.B. 1927 (to define "optical dispensing services" to allow providing contact lenses only from prescription that includes all necessary measurements and to exempt providers of this service from the optometry subtitle). However, as the Board argues, other bills were rejected that would have had the effect of specifically allowing opticians to fit contact lenses. *See, e.g.,* 1965 Session—H.B. 281; 1966 Session— H.B. 392; 1967 Session—H.B. 215; 1968 Session—S.B. 370;

1975 Session—S.B. 1117; 1976 Session—H.B. 2194; 1977 Session—H.B. 1076; 1978 Session—H.B. 776 (each of these proposed to regulate opticians or persons engaging in optical dispensing and establish a regulatory Board).

In viewing the importance of these bills, two factors are significant. First, both common practice and (after 1976) an official Attorney General's opinion, indicated that opticians were permitted to fit contact lenses. Thus, by rejecting the bills urged on behalf of the optometrists, the legislature failed to limit the activities of opticians. Second, the bills produced on behalf of optometrists had only one apparent purpose—to make contact lens fitting the particular preserve of optometry. Their rejection was a clear repudiation of that notion. However, the bills urged by opticians were quite different. Generally, they provided for the certification of dispensing opticians by creating a new regulatory bureaucracy, a committee of dispensing opticians. Enacting this legislation would have allowed opticians to fit contact lenses, but it would have done much more. Specifically, the bills would have created a new licensing bureau which the legislature was probably reluctant to approve. We conclude that rejecting these bills was not necessarily a determination that opticians could not fit contact lenses.

Several Maryland cases have recognized the efficacy of this amendment/rejection theory. For instance, in *Demory Brothers v. Bd. of Pub. Works, supra,* the Court was faced with deciding the proper interpretation of the "Prevailing Wage Law." The Court found that the rejection of certain proposed legislation was significant:

At the next following session of the General Assembly, legislation was introduced which would have specifically excluded all contracts for public school construction, additions, or alterations from the provisions of the "Prevailing Wage Law" (Senate Bill 369, 1973). This Bill failed, not once, but twice. It failed of passage initially by a vote of 22 to 18, with three Senators abstaining. On reconsideration, it failed by a tie vote of 21 to 21, with one Senator not voting. Although we have never held that

the amendment-rejection theory is a completely determinative method of ascertaining legislative intent, we have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted. In *Bosley v. Dorsey*, 191 Md. 229, 240, 60 A.2d 691 (1948), for example, we indicated that the rejection by the Senate of a bill that would have authorized the People's Counsel to appeal decisions of the Public Service Commission "... strengthens the conclusion that the Legislature has not intended that the people's Counsel shall appeal from orders of the Commission." See also *Madden v. Brotherhood and Union of Tr. Employees*, 147 F.2d 439 (4th Cir.) (1945); *Safeway Stores v. Bowles*, 145 F.2d 836 (Emer.Ct.App.) *cert. denied* 324 U.S. 847, 65 S.Ct. 683, 89 L.Ed. 1408 (1945); *Nebraska v. Chicago & N.W. Ry. Co.*, 147 Neb. 970, 25 N.W.2d 824 (1947). [*Id.* 273 Md. at 326, 329 A.2d 674.]

*See also Sheriff of Balto. City v. Abshire*, 44 Md.App. 256, 408 A.2d 398 (1979).

Furthermore, related to official inaction is the significance of long-accepted unofficial interpretations of a statute. Sutherland states:

The meaning which persons affected by an act and the public at large ascribe to it may nevertheless have an important bearing on how it should be construed.

"A practical construction given a statute by the public generally, as indicated by a uniform course of conduct over a considerable period of time, and acquiesced in and approved by a public official charged with the duty of enforcing the act, is entitled to great weight in the interpretation which should be given it, in case there is any ambiguity in its meaning serious enough to raise a reasonable doubt in any fair mind." [2A Sutherland, *Statutory Construction*, § 49.06, at 249–50 (4th Ed. Sands 1973) (footnotes omitted).]

In this case, the Court is faced with an ambiguous statute that has been given a long-standing interpretation by those affected by it and arguably by the public at large. Evidence indicates that opticians have been fitting contact lenses since their inception. Furthermore, ophthalmologists (eye physicians) refer their patients to opticians for contact lens fitting. The public has come to expect that opticians may perform this service. Such long-standing practice should not be disturbed in the absence of an unambiguous statute.

For these reasons, we conclude that the legislature has not manifested any intention that contact lens fitting be included within the § 10–101(f) definition of the practice of optometry. Although cases from other jurisdictions have interpreted varying statutes with different indicia of legislative intent, we note general support for the conclusion reached herein. For instance, in *State Board of Optometry v. Chester*, 251 Miss. 250, 169 So.2d 468, 472 (1964), the court concluded:

> We are of the opinion that as long as the dispensing optician fabricates, fits, and inserts contact lenses in the eyes in accordance with the prescriptions of an examining optometrist, ophthalmologist, oculist or physician, and requires the patient to return to the examining optometrist, ophthalmologist, oculist or physician in order that the writer of the prescription may determine whether or not the prescription has been properly filled and the contact lenses properly measured, fabricated and fitted, such optician is not engaged in the practice of optometry within the meaning of the statute.

*See also State ex rel. Londerholm v. Doolin*, 209 Kan. 244, 497 P.2d 138 (1972); *High v. Ridgeway's Opticians*, 258 N.C. 626, 129 S.E.2d 301 (1963); *State ex rel. Clifton v. Reeser*, 543 P.2d 1379 (Okla.1975).

The one constant factor in these cases is that they accentuate the necessity of requiring the patient to return to the referring physician. We agree that this is necessary. In every case in Spitz's practice, the ophthalmologist writes a

prescription and ultimately determines that it has been properly filled. Because there is not one precise set of lens specifications that will necessarily be formulated from a prescription for contact lenses, we think it is a necessary aspect of the fitting process that the optician be able to use his judgment and experience in using any combination of methods to assure a proper fit without constant referral to the ophthalmologist before the process is completed. Therefore, as long as an optician fits contact lenses pursuant to a prescription indicating that it may be used for contact lenses and directs the customer to return to the ophthalmologist to determine that the prescription has been properly filled, we conclude that the optician has not engaged in the practice of optometry.

As we said, initially, the trial court steered a course between the views of the Board and Spitz predicated on the necessity to protect the public. We find no sound basis to support his conclusion that the present state of the law dictates this result. In fact, we believe that the public is amply protected by this time-honored practice. Any change must come from the legislature.

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED IN PART AND AFFIRMED IN PART. CASE REMANDED TO THAT COURT FOR ENTRY OF A JUDGMENT CONSISTENT WITH THIS OPINION.

BOARD OF OPTOMETRY TO PAY THE COSTS.